EL PUEBLO, DEMANDANTE Y APELADO, *v.* RIVERA ET AL., ACUSADOS Y APELANTES.

APELACIÓN procedente de la Corte de Distrito de San Juan, Primer Distrito, en causa por adulteración de leche.

No. 2031.—Resuelto en marzo 26, 1923.

VENTA DE LECHE ADULTERADA — CONOCIMIENTO JUDICIAL. — Aunque generalmente las cortes no pueden tomar conocimiento judicial de los reglamentos promulgados por las distintas oficinas del gobierno, las cortes están obligadas a tomar conocimiento judicial de los reglamentos del Departamento de Sanidad que prescriben la norma para determinar lo que es leche adulterada a los fines de la ley castigando su adulteración y venta, por mandato expreso de la sección 15 de la Ley núm. 81 de 1912 para reorganizar el servicio de sanidad.

Los hechos están expresados en la opinión.

Abogados de los apelantes: *Sres. R. Sancho Bonet y E. Campillo.*

Abogado del apelado: *Sr. José E. Figueras, Fiscal.*

EL JUEZ ASOCIADO SR. FRANCO SOTO, emitió la opinión del tribunal.

En este caso se formuló acusación contra Eduardo Zayas Rivera y José Víctor Rivera por un delito de adulteración de leche. Los acusados fueron juzgados y la corte inferior les impuso la pena de 5 y 15 días de cárcel, respectivamente. No conformes con la sentencia, ellos interpusieron el presente recurso.

El único fundamento de error que apunta el apelante José Víctor Rivera en su alegato es porque "la corte carecía de la debida prueba para declarar culpable al acusado." Y el error así expresado se refiere a que el gobierno no presentó en el acto del juicio la prueba del reglamento publicado por el Departamento de Sanidad demostrativo del *standard,* o sea, el grado legal que la leche deberá contener para ser vendida de acuerdo con la ley. Esto equivale a decir que las cortes no pueden tomar conocimiento judicial de los reglamentos promulgados por el Departamento de Sanidad, siendo ésta la sóla cuestión promovida en este recurso. En

apoyo de esa teoría el apelante cita los casos de esta Corte Suprema *El Pueblo* v. *Cuadrado*, 27 D. P. R. 840, y *El Pueblo* v. *Grau*, 29 D. P. R. 1038.

La sección primera de la ley proveyendo lo necesario para la adulteración de leche, ofrecerla o tenerla para la venta, aprobada en marzo 10, 1910, dice:

"Toda persona que adulterare o diluyere leche con la intención de ofrecerla a la venta o que causare o permitiere que se ofrezca en venta, y toda persona que la vendiere, ofreciere o tuviere en venta, será culpable de delito menos grave (*misdemeanor*) y castigada con encarcelamiento que no exceda de un mes y además de dicha pena se confiscará la leche adulterada: * * * La adulteración o dilución de la leche puede probarse en la forma usual que la ley provee para la vista de causas criminales, pero en cualquier caso se considerará y se tendrá por leche adulterada o diluída aquella que no diere la prueba que se prescribe por las autoridades competentes: *Disponiéndose* que el grado legal (*standard*) de la leche deberá ser fijado por el Director de Sanidad, Beneficencia y Correcciones, y publicado para conocimiento general en la *Gaceta Oficial de Puerto Rico* y en los periódicos de mayor circulación de la Isla que se determinaren por dicho funcionario."

Con el propósito de cumplir el gobierno con la disposición anterior, presentó para acreditar la adulteración de la leche en poder de los acusados para la venta, el testimonio del perito químico del Laboratorio Insular, Rafael del Valle Sárraga, quien manifestó que dicha leche "fué analizada, resultando de dicho análisis adulterada con agua en proporción de un 20 por ciento aproximadamente."

El perito químico para determinar el hecho de la adulteración se refirió al *standard* o grado legal establecido por el Departamento de Sanidad en sus reglamentos y en tal sentido y a preguntas del acusado. dijo: "que el *standard* establecido por el Departamento de Sanidad especifica varios extremos con respecto a grasa, pero como mínimum un 3 por ciento, sólidos totales en el análisis de 10 con treinta y cinco centésimas por ciento y de acuerdo con el análisis había

una proporción de un 20 por ciento de agua añadida. En el análisis, la cantidad añadida fué 89.654, que la determina el *standard* como máximum 88 por ciento, y la que tenía en el análisis 89.654.''

Según hemos visto, la sección primera, *supra,* de la ley para adulteración de la leche, etc., aprobada en marzo 10, de 1910, es la que dispone que el grado legal (*standard*) de la leche deberá ser fijado por el Director de Sanidad, prescribiendo además la forma en que esa medida será promulgada.

Después de aquella ley y de acuerdo con otra ley, núm. 81, para reorganizar el servicio de sanidad, aprobada en marzo 14, 1912, se promulgó el reglamento núm. 29 para regular vaquerías, depósitos y ventas de leche, y por dicho reglamento se dispuso en sus artículos 9 y 10 lo siguiente:

''Art. 9.—No se venderá, ofrecerá o expondrá en venta ni se hará conducir, importará, almacenará para su expendio en la isla de Puerto Rico, ninguna leche; (*a*) que contenga menos de 12% de residuo seco de leche; (*b*) que contenga más de 88% de agua; (*c*) que contenga menos de 3% de grasa de leche o mantequilla; (*d*) que tenga una gravedad menor de 1.030; (*e*) que contenga cualquier sociedad, materia extraña o sedimento; (*f*) que contenga ácido bórico o salicílico, formaldehida o cualquier otro agente químico; (*g*) que contenga cualquier bacteria patógena; (*h*) que contenga más de 500,000 bacterias de cualquier clase, por centímetro cúbico.''

''Art. 10.—Toda leche que no se ajuste a esta norma o *standard* se considerará como leche adulterada a los efectos penales de este reglamento e impropia para el consumo;  *  *  *.''

La Ley número 81, en virtud de la cual se puso en vigor el reglamento citado y que fija el grado legal de la leche para ser vendida, en el artículo 13 prescribe:

''El Director de Sanidad someterá a la consideración y aprobación del Consejo Ejecutivo, toda regla y reglamento que se prescribiere por la Junta Insular de Sanidad, con expresión de sus ideas endosadas en el mismo.  *  *  *  Dichas reglas y reglamentos, una vez aprobados por el Consejo Ejecutivo, serán promulgados por el Gobernador de Puerto Rico y serán publicados en dos periódicos de

circulación general en la Isla, y desde entonces y sucesivamente tendrán la fuerza y efecto de ley."

Resulta ahora bien claro y definido que el grado legal o *standard* de la leche a los efectos de poder distinguirse entre leche buena y adulterada, ha sido determinado de conformidad con lo que exige la ley y el mismo debe reconocerse con fuerza y efecto legal en la forma que se ha dejado establecido por el Departamento de Sanidad. La cuestión, sin embargo, levantada por el apelante y en la que descansa toda la argumentación de su alegato es la que, a pesar de la fuerza legal de tales reglamentos, las cortes no pueden tomar conocimiento judicial de los mismos, alegando que la corte inferior cometió error resolviendo el caso y declarando culpable al acusado, sin la presentación por El Pueblo de la prueba o existencia de tales reglamentos. Pero parece que fué el propósito de nuestra legislatura no solamente que se castigara con mano firme a los violadores de vender o tener para la venta leche adulterada, sino evitar la impunidad del delito por meros tecnicismos y fundándose en los efectos saludables de la ley estableció de un modo terminante que las cortes de justicia deben tomar conocimiento judicial de tales reglas y reglamentos, lo que así se determina en el artículo 15, que dice:

"Se requiere de las cortes de justicia el tomar conocimiento judicial de la adopción de dichas reglas y reglamentos y de la publicación de los mismos que se requiere por esta Ley."

Ante un precepto semejante, está demás discutir los casos citados por el apelante en su alegato, toda vez que el primero se refiere a resoluciones de la Comisión de Alimentos y el segundo a reglas promulgadas por el Jefe del Negociado de Pesas y Medidas, y tales casos, en vista de la declaración concreta que ha hecho la ley en cuanto a las reglas y reglamentos de Sanidad, no tienen aplicación al presente caso.

Por las razones expuestas la sentencia debe confirmarse.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Aldrey y Hutchison.

El Juez Asociado Sr. Wolf no tomó parte en la resolución de este caso.